Joseph M. Alioto (SBN 42680)
Theresa D. Moore (SBN 99978)
Thomas P. Pier (SBN 235740)
Jamie L. Miller (SBN 271452)
ALIOTO LAW FIRM
225 Bush Street, 16th Floor
San Francisco, CA 94104
Telephone: (415) 434-8900
Facsimile: (415) 434-9200
Email: tpier@aliotolaw.com
Email: tmoore@aliotolaw.com
Email: jmiller@aliotolaw.com

1
2
3
4
5
6
7
8
9
10

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

**2179**

11  Wayne Taleff, Katherine R. Arcell, Judy Bray,           CASE NO.:
12  Jose' M. Brito, Jan Marie Brown, Robert D.
    Conway, Judy Crandell, Rosemary D'Augusta,          **COMPLAINT FOR**
13  Brenda K. Davis, Pamela Faust, Carolyn Fjord,        **INJUNCTIVE RELIEF**
    Don Freeland, Ted Friedli, Donald V. Fry,            **AGAINST VIOLATIONS OF**
14  Gabriel Garavanian, Harry Garavanian,                **SECTION 7 OF THE**
    Yvonne Jocelyn Gardner, Lee M. Gentry, Jay           **CLAYTON ANTITRUST ACT**
15  Glikman, Valarie Ann Jolly, Gail S. Kosach,
    John Lovell, Michael Malaney, Len Marazzo,
16  Lisa McCarthy, Michele McKechnie, Patricia
    Ann Meeuwsen, Cynthia Prosterman, Deborah
17  M. Pulfer, Dana L. Robinson, Robert A.
    Rosenthal, Bill Rubinsohn, Sondra K. Russell,
18  Sylvia N. Sparks, June Stansbury, Clyde D.
    Stensrud, Gary Talewsky, Annette M. Tippetts,
19  Diana Lynn Ultican, J. Michael Walker,
    Pamela S. Ward, David P. Wendell, Christine
20  O. Whalen,

21                 Plaintiffs,
22
           v.
23
    SOUTHWEST AIRLINES CO.,
24  GUADALUPE HOLDINGS CORP.,
    AIRTRAN HOLDINGS, INC.,
25
                 Defendants.
26
27
28

1    Plaintiffs are and will be direct purchasers of airline tickets for travel within the United

2    States. The plaintiffs bring this action under Section 16 of the Clayton Antitrust Act, 15 U.S.C.

3    §§ 18, 26, to enjoin and prohibit the merger of the defendants Southwest and AirTran. Plaintiffs

4    complain and allege as follows:

5

6    **INTRODUCTION**

7    1.    On September 27, 2010, the defendants announced that they had agreed to combine

8    in an all stock transaction, valued at more than $1.4 billion, merging Southwest Airlines Co.

9    ("Southwest") and Southwest's wholly owned subsidiary Guadalupe Holdings Corp.

10   ("Guadalupe"), with AirTran Airways ("AirTran"), eliminating the substantial competition

11   between them. It is proposed that the unlawful combine would operate under the Southwest

12   name.

13   2.    "Low cost carriers" (LCCs) operate on a point-to-point basis and travel high

14   density routes rather than to and from small communities. The largest U.S. LCCs are Southwest

15   Airlines, JetBlue, Spirit Airlines, Virgin Airlines, Allegiant, AirTran, Frontier, and Sun Country

16   Airlines. In contrast, "network carriers," operate on a "hub-and-spoke" business model. There

17   are six major U.S. network carriers: United, Continental, American Airlines, Delta Airlines, U.S.

18   Airways, and Alaska Airlines.

19   3.    Defendants Southwest and AirTran are both low cost carriers.

20   4.    The effect of the announced merger between Southwest and AirTran may be

21   substantially to lessen competition, or to tend to create a monopoly, in the transportation of airline

22   passengers in the United States and certain submarkets and in violation of Section 7 of the

23   Clayton Antitrust Act, 15 U.S.C. § 18.

24   5.    The probable and planned anticompetitive effects of this unlawful combination

25   are increases in prices and fares, elimination and/or curtailment of services, elimination or

26   curtailment of frequency of flights, curtailment of capacity of aircraft and available seats for

27   passage, elimination of tens of thousands of jobs, the deterioration of quality of service, the

28   addition of charges for amenities otherwise considered part and parcel of the service, the

1  elimination or substantial cutback of traffic to hubs, the creation of monopolies for passenger

2  air traffic from and to major cities, and the encouragement and trend to further concentrate the

3  industry toward ultimate monopoly.

4    6. Plaintiffs are individuals who have purchased airline tickets for travel within the

5  United States in the past, and expect to continue to do so in the future. They are threatened with

6  loss or damage by the defendants' merger in violation of Section 7 in the form of higher ticket

7  prices and diminished service, and, accordingly, they bring this action for preliminary and

8  permanent injunctive relief against the merger pursuant to Section 16 of the Clayton Antitrust

9  Act, 15 U.S.C. § 26.

10

11  ## JURISDICTION

12    7. This action is brought under Section 16 of the Clayton Antitrust Act, 15 U.S.C.

13  §26, to prohibit the consummation and the effectuation of defendants' planned unlawful

14  merger in violation of Section 7 of the Clayton Antitrust Act, 15 U.S.C. §18. This Court has

15  subject matter jurisdiction of the federal antitrust claims asserted in this action under Section

16  16 of the Clayton Antitrust Act, 15 U.S.C. §26, and Title 28 United States Code Sections 1331

17  and 1337.

18  ## THE PARTIES

19    8. Each of the plaintiffs named herein below is an individual and a citizen of the

20  state listed as the address for each such plaintiff, and in the four years next prior to the filing

21  of this action, each plaintiff has purchased airline tickets for travel within the United States,

22  and each plaintiff expects to continue to purchase airline tickets for travel within the United

23  States in the future:

24     Katherine R. Arcell, 4427 S. Miro St., New Orleans, LA 70125;

25     Judy Bray, 1126 Hill Circle, Colorado Springs, CO 80904;

   Jose' M. Brito, 100 California Avenue, Reno NV 89509;

26     Jan Marie Brown, 975 Kennedy Dr., Carson City, NV, 89706;

27     Robert D. Conway, 6160 W Brooks Ave., Las Vegas, NV 89108;

28

| | |
|---|---|
| 1 | Judy Crandell, 9135 Rain Dance Way, Reno, NV 89506; |
| 2 | Rosemary D'Augusta, 347 Madrone St., Millbrae, CA 94030; |
| 3 | Brenda K. Davis, 11022 Old Military Trail, Forney, TX, 75126; |
| 4 | Pamela Faust, 6227 Whileaway Dr., Loveland, Ohio 45140; |
| 5 | Carolyn Fjord, 4405 Putah Creek Road, Winters, CA 95694; |
| 6 | Don Freeland, 73801 White Sands Dr., Thousand Palms, CA 92276; |
| 7 | Ted Friedli, 50 Atlantic Ave., Long Branch, NJ 07740; |
| 8 | Donald V. Fry, 6740 Northrim Ln., Colorado Springs, CO 80919; |
| 9 | Gabriel Garavanian, 104 Sequoia Road, Tyngsboro, MA 01879; |
| 10 | Harry H. Garavanian, 14 Stavely Street, Lowell, MA 01852; |
| 11 | Yvonne Jocelyn Gardner, 10-Gold Coin Ct., Colorado Springs, CO 80919; |
| 12 | Lee M. Gentry, 7021 Forestview Dr., West Chester, OH 45069-3616; |
| 13 | Jay Glikman, 4265 Marina City Dr #809, Marina del Rey, CA 90292; |
| 14 | Valarie Ann Jolly, 2121 Dogwood Loop, Mabank, TX 75156; |
| 15 | Gail S. Kosach, 4085 Ramrod Cir., Reno, NV 89519; |
| 16 | John Iverson Lovell, 2581 Knightsbridge SE, Grand Rapids, MI 49546; |
| 17 | Michael C. Malaney, 5395 Egypt Creek NE., Ada, MI 49301; |
| 18 | Len Marazzo, 1260 Springer Ct., Reno, NV 89511; |
| 19 | Lisa Ruth McCarthy, 35 Lancashire Place, Naples, FL 34104; |
| 20 | Michele McKechnie, 411 Westover Dr., Euless, TX 76039; |
| 21 | Patricia Ann Meeuwsen, 1062 Wedgewood, Plainwell, MI 49080; |
| 22 | Cynthia Prosterman, 527 20th Ave., San Francisco, CA 94121; |
| 23 | Deborah M. Pulfer, 16264 E. Mason Rd., Sidney, OH 45365; |
| 24 | Dana L. Robinson, 127B Palm Bay Terrace, Palm Beach Gardens, FL 33418; |
| 25 | Robert A. Rosenthal, 4659 Bridle Pass Drive, Colorado Springs, CO 80923; |
| 26 | Bill Rubinsohn, 261 Old York Road, Jenkintown, PA 19046; |
| 27 | Sondra K. Russell, 1206 N. Loop 340, Waco, TX 76705; |
| 28 | Sylvia N. Sparks, 3320 Conte Drive, Carson City, NV 89701; |

| | |
|---|---|
| 1 | June Stansbury, 363 Smithridge Park, Reno, NV 89502; |
| 2 | Clyde D. Stensrud, 1529 10th St W., Kirkland, WA 98033; |
| 3 | Wayne Taleff, 768 Farmsworth Ct., Cincinnati, OH 45255; |
| 4 | Gary Talewsky, 12 Courtland Dr., Sharon, MA 02067; |
| 5 | Annette M. Tippetts, 2783 East Canyon Crest Dr., Spanish Fork, Utah 84660; |
| 6 | Diana Lynn Ultican, 9039 NE Juanita Dr, #102, Kirkland, WA 98034; |
| 7 | J. Michael Walker, 11865 Heather Ln., Grass Valley, CA 95949; |
| 8 | Pamela S. Ward, 1322 Creekwood Dr., Garland, TX 75044; |
| 9 | David P. Wendell, 100 Vine St., Reno, NV 89503; |
| 10 | Christine O. Whalen, 1131 Pine St., New Orleans, L, 70118; |

9. Defendant Southwest Airlines Co. ("Southwest") is a corporation incorporated under the laws of the State of Texas with its principal place of business in Dallas, Texas.

10. As of September 30, 2010, Southwest was the largest air carrier in the United States, as measured by the number of *domestic passengers carried*.

11. Southwest had a market share of approximately 14.2% in 2010, the 2nd largest domestic market share, as measured by *revenue passenger miles*.

12. Southwest is engaged in the business of transporting passengers and cargo and has approximately 35,000 full-time employees.

13. Southwest uses the "Point to Point" flight routing system, serving 72 cities in 37 states, with more than 3,400 flights a day coast-to-coast.

14. Defendant Guadalupe Acquisition Corp., ("Guadalupe") is a Nevada corporation and wholly-owned subsidiary of Southwest. Southwest and/or Guadalupe may be collectively referred to herein as Southwest.

15. Defendant AirTran Holdings, Inc. ("AirTran") is a corporation incorporated under the laws of the State of Nevada with its principal place of business in Orlando, Florida. AirTran through its wholly-owned subsidiary AirTran Airways, Inc., operates scheduled airline service throughout the United States.

16.     AirTran is the seventh largest domestic carrier, with more than 19.5 billion RPMs in 2010.

17.     AirTran has more than 1,000 daily departures, primarily in the Eastern and Midwestern United States, serving over 70 destinations in the United States, Mexico, and the Caribbean.

18.     AirTran employed approximately 8,300 employees as of February 25, 2011.

## NATURE OF TRADE AND COMMERCE

19.     The relevant product and geographic markets for purposes of this action are the transportation of airline passengers in the United States, and the transportation of airline passengers to and from the United States on international flights to Mexico and the Caribbean.

20.     Southwest and AirTran are substantial rivals and competitors in the relevant market.

21.     Southwest and AirTran are substantial potential rivals and potential competitors in the relevant market.

22.     Not only do Southwest and AirTran provide competing passenger service against each other on a number of passenger routes, but also they are potentially able to provide competing passenger service against each other on any route anywhere in the United States if they believe it would be profitable to do so.

23.     Southwest has the capability to serve every major market in the United States.

24.     AirTran has the capability to serve every major market in the United States.

25.     The behavior of Southwest is constrained by the actual and potential competition from AirTran throughout the entire relevant market and submarkets.

26.     The behavior of AirTran is constrained by the actual and potential competition from Southwest throughout the entire relevant market and submarkets.

27.     The market for the transportation of airline passengers in the United States is in and part of interstate commerce, makes extensive use of the instrumentalities of interstate commerce, and substantially affects interstate commerce. Airline passengers travel in a

continuous and uninterrupted flow of interstate commerce. Airline travel is a continuous and uninterrupted flow of interstate commerce. Materials used in the construction of airplanes are purchased and shipped in a continuous and uninterrupted flow of interstate commerce.

28.     Any restraint of trade in the transportation of airline passengers in the United States, including the restraints specifically alleged in this complaint, directly and substantially restrains and affects interstate commerce.

## CONDUCT GIVING RISE TO VIOLATIONS OF LAW

29.     On September 27, 2010, Southwest and AirTran announced that they had entered into a definitive merger agreement for Southwest to acquire AirTran, in a deal valued at approximately $1.4 billion, or $3.4 billion including AirTran's debt and capitalized aircraft-operating leases.

30.     The new airline will operate under the Southwest name.

31.     The merging companies are AirTran and Guadalupe Holdings Corp., a Nevada corporation and wholly owned subsidiary of Southwest Airlines. Guadalupe will be merged into AirTran, which will then become a wholly owned subsidiary of Southwest Airlines.

32.     After the merger closes, AirTran will be merged into a new limited liability company set up as a Texas company, LLC Sub, which will become a wholly owned subsidiary of Southwest.

33.     The chief executive officer of the combined company will be Gary Kelly, the current chairman, president, and CEO of Southwest.

34.     Bob Fornaro, chairman, president, and CEO of defendant AirTran, will continue to be involved in the integration of the two companies.

35.     Through secret and private meetings, Mr. Kelly of Southwest met on more than one occasion with Mr. Fornaro of AirTran.

36.     One or more the secret and private meetings of Mr. Kelly and Mr. Fornaro were carried on outside of their offices, including hotels.

1    37.    At one or more of the secret and private meetings, Messrs. Kelly and Fornaro

2    discussed the purposes and probable effects of the merger.

3    38.    At one or more of the secret and private meetings, Messrs. Kelly and Fornaro

4    discussed airline fares in general and specifically.

5    39.    At one or more of the secret and private meetings, Messrs. Kelly and Fornaro

6    discussed the frequency of flights.

7    40.    At one or more of the secret and private meetings, Messrs. Kelly and Fornaro

8    discussed the elimination or curtailment of the use of hubs.

9    41.    At one or more of the secret and private meetings, Messrs. Kelly and Fornaro

10   discussed the curtailment of capacity.

11   42.    At one or more of the secret and private meetings, Messrs. Kelly and Fornaro

12   discussed the firing of employees.

13   43.    At one or more of the secret and private meetings, Messrs. Kelly and Fornaro

14   discussed the type of aircraft to be eliminated.

15   44.    At one or more of the secret and private meetings, Messrs. Kelly and Fornaro

16   discussed the charges for services previously given to passengers for free.

17   45.    At one or more of the secret and private meetings, Messrs. Kelly and Fornaro

18   discussed the potential fare increases in the monopoly submarkets that would be created by the

19   combine.

20   46.    At one or more of the secret and private meetings, Messrs. Kelly and Fornaro

21   discussed the potential fare increases in the duopoly submarkets created by the combine.

22   47.    The combined company will carry over 113 million passengers per year, provide

23   access to more than 106 destinations from coast to coast, Mexico and the Caribbean, with 685

24   all-Boeing aircraft, and employ approximately 43,000 employees.

25   48.    Defendants Southwest and AirTran are both low cost carriers ("LCCs").

26   49.    Only seven true low-cost carriers now compete in the U.S. market.

27

28

*Complaint for Injunctive Relief Against Violations of Section 7 of the Clayton Antitrust Act*

50. Of the seven LCCs, Southwest is by far the dominant carrier, accounting for approximately 60% of the combined market share of the *low-cost carriers* that report data to the DOT.

51. AirTran controls almost 15 percent of the LCC's combined market share of the *low-cost carriers* that report data to the DOT.

52. The combined company would account for approximately 75% of the combined market share of the low cost carriers.

53. Pre-merger, Southwest's *overall* domestic market share is approximately 14.2%.

54. Pre-merger, AirTran's *overall* domestic market share is approximately 3.4%.

55. Combined, Southwest and AirTran will have more than 98 billion RPMs. Domestically, their combined market share as measured by RPM's would be 17.7%.

56. If the merger is consummated, it will result in lower capacity; that is, fewer seats in the sky, which, in turn, will result in higher ticket fares for consumers.

57. Defendants' merger would take place in and further concentrate an already highly concentrated market, characterized by mergers, including the most recent merger of United and Continental Airlines in 2010, which made United the world's largest carrier.

58. The top 9 competitors will have concentrated into 6 – controlling a full 90% of the market – in just 24 months. The recent United-Continental merger has further concentrated the market with an acquisition of major participants: United was the third largest airline in the United States measured by 2009 operating revenue, with 14.2% of the market, while Continental was the fourth largest airline, with 10.7% of the market. The combined airline, with 25.0% share of the market, is now effectively the largest airline in the world, along with Delta.

59. In addition, defendants themselves are the products of mergers and acquisitions.

60. In 1985, Southwest bought MuseAir, renamed it TranStar Airlines.

61. In 1993, Southwest bought MorrisAir, a competing airline based on Salt Lake City, Utah; and in 2008, Southwest acquired assets from bankrupt ATA airlines.

57. In 1997, ValuJet announced it would merge with the much smaller Airways Corporation, parent of AirTran Airways. The merged company would retain the AirTran name.

62. Others mergers include that between Northwest and Republic Airlines in 1986, and between U.S. Airways and America West in 2005.

63. According to Jeffrey Breen, President of Cambridge Aviation Research, "We find more airports and routes red-flagged in our analysis of this proposed merger than for United-Continental."

64. A recent report by Cambridge Aviation Research on the Southwest-AirTran merger, red-flagged 33 routes, including 16 pushed into monopoly status as a result of the merger.

65. Jeffrey Breen of Cambridge Aviation Research notes that, "We find the most cause for concern in Baltimore and Orlando which together account for more than 80% of passengers traveling along red-flagged routes."

66. At the airport level, 18 U.S. airports are red-flagged for increases in market concentration exceeding DOJ guidelines. From most-affected to least: Baltimore (BWI), Chicago Midway (MDW), Orlando International (MCO), Houston Hobby (HOU), Tampa (TPA), Indianapolis (IND), Fort Meyers (RSW), Columbus (CMH), Buffalo (BUF), Milwaukee (MKE), Jacksonville (JAX), Fort Lauderdale (FLL), San Antonio (SAT), New Orleans (MSY), Kansas City (MCI), St. Louis (STL), Palm Beach (PBI), and Las Vegas (LAS).

67. The new combined company's dominance at the airports listed above is substantially likely to result in higher fare prices for flights to or from those airports.

68. Of the 33 routes red-flagged, 16 are pushed into monopoly status. The red-flagged route list includes the combined carrier's second-busiest route, Baltimore-Orlando, whose one million annual passengers stand to lose airline choice as this proposed merger pushes the route into monopoly.

1   69.   Defendants have overlapping non-stop flights on 19 routes, including,

2   Baltimore-Boston; Baltimore-Ft. Lauderdale; Baltimore-Indianapolis; Baltimore-Jacksonville;

3   Baltimore-Orlando; Baltimore-Milwaukee; Baltimore-New Orleans; Baltimore-Tampa;

4   Baltimore-Fort Myers, FL.; Chicago Midway-Fort Myers, FL.; Indianapolis-Tampa; Las

5   Vegas-Milwaukee; Orlando-Buffalo, Orlando-Columbus, OH; Orlando-Indianapolis; Orlando-

6   Chicago Midway; Orlando-Milwaukee; Orlando-Philadelphia; and Orlando-Pittsburgh.

7   70.   If the Southwest and AirTran combination were allowed, the airline would

8   account for nearly 95 percent of available seat miles on offer at Chicago-Midway International

9   Airport, 92 percent at Hobby Airport in Houston, and 70 percent of Baltimore/Washington

10  International Airport.

11  71.   If the Southwest and AirTran combination were allowed, the merger will reduce

12  the number of competitors in 127 nonstop and connecting markets and will reduce the number

13  of competitors from two to one in 14 nonstop and connecting markets.

14  72.   Defendant Southwest says it intends an "orderly and reasonable schedule" for

15  ending flights at Dallas/Fort Worth International following the carriers' merger.

16  73.   Former U.S. Rep. Jim Oberstar, Chairman of the House Transportation and

17  Infrastructure Committee from 2007 until 2011, has stated that, "The future of competition

18  among airlines at every level of the industry, legacy and low-cost alike, is at stake in the

19  Southwest-AirTran merger."

20  74.   Defendants compete now on hundreds of domestic connecting routes, where

21  competition will be reduced or eliminated as a result of defendants' merger.

22  75.   The potential for increased collusion among the remaining airlines is significant,

23  because the domestic passenger airlines, including, *inter alia*, these defendants, have in the

24  past colluded to fix prices with regard to airfares, surcharges, and cargo prices, and to fix other

25  terms and conditions of air transportation and travel.

26  76.   In addition to the degree of market concentration, there are significant barriers to

27  entry in the relevant market, as well as a history of a lack of successful new entry. The

28  relevant market has been characterized by the exit, rather than the entry, of firms. The

prospect of new entry is therefore unlikely to eliminate any of the anticompetitive effects that will eventuate from the defendants' merger and the increasingly concentrated structure of the relevant market.

77. The defendants' proposed merger will cause harm to consumers, including the plaintiffs, by generating higher airfares, by reducing the number of flights on particular routes, and by eliminating air service to smaller communities. Consumers, including the plaintiffs, will thus pay more for less airline service than would be the case in the absence of defendants' merger.

78. The defendants' proposed merger is also likely to lead to other mergers and further concentration in the already highly concentrated relevant market. American Airlines, which until the Delta-Northwest merger was the largest domestic airline, will likely combine with another carrier, like U.S. Airways, the only remaining medium-sized carrier. Both of the CEO's of American and U.S. Airways have already indicated publicly of their approval of the elimination of capacity and of their desire to further concentrate the industry and eliminate even more capacity, with the obvious result of higher fares.

79. There are 29 major airports in the United States, located in the following cities: Atlanta, Baltimore, Boston, Charlotte, Chicago, Dallas, Denver, Detroit, Fort Lauderdale, Houston, Las Vegas, Los Angeles, Miami, Minneapolis, New York, Newark, Orlando, Philadelphia, Phoenix, Portland, Salt Lake City, San Diego, San Francisco, Seattle, Tampa, and Washington D.C.

80. Each major U.S. passenger airline, including LCC defendants Southwest and AirTran, has the ability and financial capacity to offer competitive flights between any two major cities in the United States, whether or not they are currently offering such flights.

81. Each major U.S. passenger airline, including LCC defendants Southwest and AirTran, has the ability and financial capacity to establish a competitive presence in any of the major airports located throughout the United States by, inter alia, leasing or otherwise utilizing terminal slots, hiring employees, and directing more flights to and from the given airport.

82. Since the LCCs and major airlines already offer flights to and from various major U.S. cities, each such airline, including defendants Southwest and AirTran necessarily has the managerial expertise to offer similar flights between any two major cities in the United States.

83. The major U.S. passenger airlines, including LCC defendants Southwest and AirTran, frequently trade, sell, lease or purchase slots from other airlines in each of the major 29 airports throughout the United States.

84. The LCCs and major U.S. passenger airlines with significant market share in specific regions or major airports, including defendants Southwest and AirTran, endeavor to keep other LCCs and major airlines from entering the market with competitive flights.

85. On information and belief, each of the LCCs and major U.S. passenger airlines, including defendants Southwest and AirTran, has created internal documents reflecting a financial and economic cost/benefit analysis of increasing its presence in each or many of the major U.S. airports.

86. On information and belief, each of the LCCs and major U.S. passenger airlines, including defendants Southwest and AirTran, has created internal documents reflecting its analysis of how the market for air transportation would be impacted within each regional market or major U.S. airport by the entry of another LCC or major U.S. passenger airline into that region or major airport.

87. The entry of Southwest or AirTran into regions or major airports that are dominated, controlled, or serviced by other LCCs or major passenger airlines would result in lower prices, increased service levels, and/or other pro-competitive effects on flights within the region to or from the given major airport.

88. As the foregoing paragraphs show, the effect of the defendants' merger, if consummated, may be substantially to lessen competition, or to tend to create a monopoly in the relevant markets.

89. By reason of the defendants' proposed merger, the plaintiffs are threatened with loss or damage in the form of higher ticket prices and diminished service. If the defendants'

1  merger is consummated, the plaintiffs will sustain irreparable harm for which damages will be
2  unable to compensate plaintiffs, in that service once lost cannot easily be restored.
3  Accordingly, plaintiffs bring this action for both preliminary and permanent injunctive relief
4  against defendants' merger.

## VIOLATION ALLEGED

## Clayton Act, Section 7

7      90.     The conduct of defendants described hereinabove, specifically their agreement
8  to merge, constitutes a violation of Section 7 of the Clayton Antitrust Act, 15 U.S.C. § 18, in
9  that the effect of the proposed merger of defendants may be substantially to lessen
10  competition, or to tend to create a monopoly in the transportation of airline passengers in the
11  United States and the transportation of airline passengers to and from the United States on
12  international flights; by reason of which violation the plaintiffs are threatened with loss or
13  damage in the form of higher ticket prices and diminished service, as well as irreparable harm
14  for which damages will be inadequate to compensate plaintiffs, such that plaintiffs are entitled
15  to bring suit under Section 16 of the Clayton Antitrust Act, 15 U.S.C. § 26, to obtain
16  preliminary and permanent injunctive relief against defendants' merger, and to recover their
17  cost of suit, including a reasonable attorney's fee.

## PRAYER FOR RELIEF

19      WHEREFORE, plaintiffs demand the following relief from this Honorable Court:

20      A.     Declaring, finding, adjudging, and decreeing that the agreement of the
21  defendants to merge violates Section 7 of the Clayton Antitrust Act, 15 U.S.C. § 18.

22      B.     Preliminarily enjoining the defendants from consummating their merger during
23  the pendency of this action.

24      C.     Permanently enjoining the defendants from consummating their merger.

25      D.     Awarding to plaintiffs their cost of suit, including a reasonable attorney's fee,
26  as provided by Section 16 of the Clayton Antitrust Act, 15 U.S.C. § 26.

27      E.     Granting to plaintiffs such other and further relief to which they may be entitled
28  and which the Court finds to be just and appropriate.

- 14 -
*Complaint for Injunctive Relief Against Violations of Section 7 of the Clayton Antitrust Act*

1

2

3

4

5    Dated: May 3, 2011

6
                                        ALIOTO LAW FIRM
7

8
                                        By:
9                                          Thomas Pier
                                           ALIOTO LAW FIRM
10                                         225 Bush Street, 16th Floor
                                           San Francisco, CA 94104
11                                         Telephone: (415) 434-8900
                                           Facsimile: (415) 434-9200
12                                         Email: tpier@aliotolaw.com
                                           E-mail: tmoore@aliotolaw.com
13                                         E-mail: jmiller@aliotolaw.com

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*Complaint for Injunctive Relief Against Violations of Section 7 of the Clayton Antitrust Act*

# EXHIBIT A

# Origins of Legacy Airlines and Southwest
## History of Mergers and Acquisitions



**EXHIBIT B**



About RITA | Press Room | Offices | Jobs | Photos & Video | Contact Us

| About BTS | BTS Press Room | Data and Statistics | Publications | Subject Areas | External Links |

RITA > BTS

## TranStats

Search this site:
Advanced Search

### Resources
Database Directory
Glossary
Upcoming Releases
Data Release History

### Data Finder
**By Mode**
Aviation
Maritime
Highway
Transit
Rail
Pipeline
Bike/Pedestrian
Other
**By Subject**
Safety
Freight Transport
Passenger Travel
Infrastructure
Economic/Financial
Social/Demographic
Energy
Environment
National Security

### Quick Answers
Carrier Snapshots
Airline Fuel Cost and Consumption
Air Freight Summary
Employment

Airport Snapshots
Holiday Flight Delays
Inter-Airport Distances
Tarmac Times

#### Airline Activity : National Summary (U.S. Flights)

|  | 2010 * | 2011 * | Change |
|---|---|---|---|
| Enplaned Passengers (million) | 619 | 630 | 1.8% |
| Departures (000) | 9,189 | 9,121 | -0.7% |
| Freight/Mail (million lbs) | 19,053 | 19,924 | 4.6% |
| Load Factor (%) | 81.3 | 82.3 | 1.0 points |
| Airlines with scheduled service | 103 | 99 | -3.9% |

* 12 months ending January of each year

#### Airline Domestic Market Share February 2010 - January 2011



| Airlines | Share |
|---|---|
| Delta | 16.6% |
| Southwest | 14.2% |
| American | 13.6% |
| United | 10.1% |
| US Airways | 7.8% |
| Continental | 7.3% |
| JetBlue | 4.4% |
| AirTran Corporation | 3.4% |
| Alaska | 3.3% |
| SkyWest | 2.1% |
| Other | 17.2% |

Market share based on Revenue Passenger Miles February 2010 - January 2011.

#### Top Domestic Routes February 2010 - January 2011



Based on enplaned passengers of all airports for a city pair February 2010 - January 2011.

### At a Glance


Click a bar for details. Mouseover it for percentage.

**Average Air Fares** more...


Click a bar for details. Mouseover it for total.

Research and Innovative Technology Administration (RITA) · U.S. Department of Transportation (US DOT)
1200 New Jersey Avenue, SE · Washington, DC 20590 · 800 853 1351 · E-mail RITA

Accessibility | Disclaimer | Fast Lane | FedStats | Freedom of Information Act | No FEAR Act | OIG Hotline | Privacy Policy | RSS | Site Map | USA.gov | White House | Wireless

Plug-ins: PDF Reader | Flash Player | Excel Viewer | PowerPoint Viewer | Word Viewer | WinZip